# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>vs.<br><br>HANNIE EUGENE RICE,<br><br>                  Defendant. | 8:23CR188<br><br><br>FINDINGS AND<br>RECOMMENDATION |

      This matter comes before the Court on the Motion to Suppress Evidence and Request for Franks Hearing (Filing No. 21) filed by Defendant, Hannie Eugene Rice. Defendant filed a brief (Filing No. 21-1) in support of the motion and the Government filed a brief in opposition (Filing No. 26). The Court held pre-hearing status conferences with counsel on January 17, March 7, and March 14, 2024.[1] An evidentiary hearing on the motion was held on May 9, 2024.[2] Defendant was present at the evidentiary hearing with his attorney, Federal Public Defender, Yvonne D. Sosa. The Government was represented by Special Assistant United States Attorney, Joseph P. Meyer. Joshua Lee Townsend, who at the time of the events at issue was a deputy with the Burt County Sheriff's Office ("Deputy Townsend"), and Dale L. Jones, the owner of the residence searched by law enforcement, testified at the hearing. The Court received into evidence Exhibits 1 through 11 offered by the Government, and Exhibits 101 to 108, and 110 offered by Defendant.

      A transcript (TR.) of the hearing was prepared and filed on June 6, 2024. (Filing No. 46). At Defendant's request, the Court permitted post-hearing briefing, and advised the parties this matter would not be fully submitted until after such briefing. Defendant filed a supplemental brief (Filing No. 49) on June 26, 2024, and the Government filed a supplemental brief (Filing No. 50) on July 3, 2024. The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that Defendant's motion be denied.

---

[1] The first two conferences were held before the Honorable Susan M. Bazis, who at the time was United States Magistrate Judge for the District of Nebraska prior to her appointment as a District Judge, and before the reassignment of this case to the undersigned magistrate judge on March 11, 2024.

[2] The evidentiary hearing was set for the purpose of adducing evidence regarding the motion to suppress; the Court did not make a finding that Defendant had made a substantial preliminary showing necessary for a *Franks* hearing. (TR. 6). The government requested an evidentiary hearing regarding the motion to suppress. (Filing No. 26 at p. 2). At the hearing, defense counsel clarified the inclusion of a request for *Franks* hearing in the motion's title was scrivener's error, and Defendant was not raising a *Franks* issue. (TR. 68-69).

## BACKGROUND

Defendant is charged in the Indictment with one count of possession with intent to distribute 5 grams or more of methamphetamine (actual), its salts, isomers, or salts of its isomers, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (Filing No. 1). The evidence supporting the charge arises out of the execution of a search warrant at a residence located at 214 N. Thomas Avenue in Oakland, Nebraska on May 6, 2023.[3] The search warrant was issued by a Burt County county court judge on May 6, 2023, upon an application and affidavit submitted by Deputy Townsend. See Exhibit 1. Deputy Townsend's application and affidavit contained the following information:

   a. Burt County Sheriff's Office is investigating individuals at 214 N Thomas Ave Oakland Nebraska for using and selling controlled substances. Your affiant is aware that Hannie Rice [Defendant], Richard McLean, Justin McLean, Ethan McLean, and Christine Bass all reside at this address.
   b. In early January of 2023 your affiant arrested Samantha Craig for possessing methamphetamine. A couple of days after the arrest Ms. Craig informed your affiant that Brianna Tranmer and herself picked up a quarter pound of methamphetamine in November[] 2022 at 214 N Thomas Ave, Oakland, Nebraska. Ms. Craig further stated that Brianna Tranmer advised her that she had sold approximately 6 pounds of methamphetamine in Omaha, Nebraska within a short period of time and all the methamphetamine she obtained came from a guy named Hannie [Defendant] at 214 N Thomas Ave.
   c. On January 14, 2023[,] Washington County Sheriff's Office arrested Brianna Tranmer for Possession of Methamphetamine with the Intent to Deliver.
   d. On January 18, 2023[,] Your Affiant stopped and arrested Brianna Tranmer for Possession of Methamphetamine and Assault on two Law Enforcement Officers.
      i. Ms. Tranmer advised your Affiant that she has obtained large quantities such as pounds of methamphetamine from her supplier. Ms. Tranmer advised that she was selling the methamphetamine that she obtained.
      ii. After speaking to Ms. Tranmer initially your affiant reached out to DEA Task Force Officer Cleveland and wrote a search warrant for Ms. Tranmer's cellphone.
   e. On January 19, 2023[,] your affiant obtained a search warrant for Ms. Tranmer's cellphone.
   f. On January 20, 2023[,] your affiant and TFO Cleveland went to Washington County Jail in Blair[,] Nebraska to speak to Ms. Tranmer.
      i. Ms. Tranmer advised authorities that she was obtaining a quarter pound of methamphetamine to a half a pound from [Defendant]. Ms. Tranmer

---

[3] Defendant describes the search as a "warrantless search" of his basement apartment at 214 N. Thomas Avenue, in Oakland, Nebraska, (Filing No. 21 at p. 1), but to be clear, law enforcement were executing a search warrant issued for 214 N Thomas Ave., Oakland, Nebraska. (Ex. 1).

        advised authorities that she would message or call [Defendant] to set up when she would need more and that she paid [Defendant] through an app called Cash App and in person.
      ii.  Ms. Tranmer further advised that [Defendant] would get shipments in the mail by USPS for up to 3lbs of methamphetamine from a person in Somerset California. Ms. Tranmer advised that it would come in peanut butter and different things to disguise it.
      iii.  Ms. Tranmer also advised that [Defendant] works for a company that has him away from home a lot of the time.
- g. After speaking to Ms. Tranmer your affiant gave TFO Cleveland Ms. Tranmer's cellphone to have it dumped by their Cellebrite system.
- h. A couple of days later your affiant received the data from Ms. Tranmer's cellphone. Your affiant found numerous messages of Ms. Tranmer selling methamphetamine as well as obtaining methamphetamine from [Defendant] and cash app transactions from Ms. Tranmer to [Defendant]. Below are notable messages and cash app transactions between [Defendant] and Ms. Tranmer[:]

(Ex. 1 at pp. 3-6). The warrant affidavit then set forth several pages of text message exchanges from November 25, 2022, through December 21, 2022, between Defendant and Ms. Tranmer discussing payments and meeting points for apparent drug transactions, which included Defendant's residence (e.g., Defendant: "When you get here call I'll come out to show you the way"; Ms. Tranmer: "at your door"), as well as three CashApp payments from Ms. Tranmer to Mr. Rice on January 10, 12, and 13, 2023. (Ex. 1 at pp. 6-10). The warrant affidavit continues:

- i. During the investigation TFO Cleveland reached out to a Post Master at USPS and found out that it showed packages from California were being shipped to 214 N Thomas Ave, Oakland, Nebraska. TFO Cleveland had all new packages shipped to that address flagged. The packages then stopped coming in as it appeared [Defendant] had become spooked. Your affiant then reviewed messages from Ms. Tranmer while she was in custody and learned Ms. Tranmer was informing people that the feds tried getting her to roll on her supplier. After that time your affiant no longer observed [Defendant] at the residence at 214 N Thomas Ave, Oakland and also observed that the vehicle registered to him, a red Ford truck, remained parked at the residence and was not moved.
- j. On April 8, 2023[,] your affiant received numerous complaints on Justin McLean about reckless driving in Oakland, Nebraska. Your affiant met up with Mr. McLean to discuss the complaints and advised Mr. McLean that he could leave at any time and that he was not detained. During the conversation your affiant asked Mr. McLean about people residing at 214 N Thomas. Mr. McLean advised that his two cousins live downstairs, with one being in the hospital and the other one being on the road for work. Mr. McLean advised that [Defendant] is his cousin that works on the road and advised that he will leave for a month or more and come back for a week or less. Mr. McLean was also asked about if Mr. McLean had obtained any employment as your affiant was aware that Mr.

3

      McLean had been seeking employment. Mr. McLean further stated that he does not currently have a job due to no one hiring and that he smokes marijuana almost every day at his residence to deal with anxiety. Mr. McLean further stated that he did not care about sharing that information with me because no one cares about marijuana anymore.

k. On May 3, 2023[,] your affiant was dispatched to locate a missing juvenile in Oakland, Nebraska. During the investigation your affiant learned the missing juvenile was seen with Ethan McLean after school. Your affiant went to 214 N Thomas Ave to speak to Ethan McLean. Your affiant arrived and was greeted by Richard McLean, Ethan McLean's father. Your affiant explained why he was there and what he had learned about where the missing juvenile was last seen. However, while speaking to Richard and Ethan McLean your affiant smelt a strong odor of marijuana emitting from the residence. Your affiant first noticed the smell when your affiant walked up to the residence and the smell became stronger once Richard McLean opened the door. Due to searching for the missing child your affiant did not apply for a search warrant at that time. Your affiant was also tied up with being the only officer on duty for Burt County Sheriff's Office on May 4, 2023.

l. The fact that Justin McLean advised he smokes marijuana every day and that [Defendant] was both possessing and selling methamphetamine makes it probable that they have their own paraphernalia to consume controlled substances. Your affiant is aware from his training and experience that methamphetamine users often use marijuana as well. Your affiant is also aware that people who smoke marijuana and methamphetamine often have their own drug paraphernalia.

m. On May 5, 2023[,] during surveillance of 214 N Thomas Ave your affiant observed that [Defendant]'s red truck was moved to the other side of the street, when it had previously been parked on the other side for multiple weeks without moving. Your affiant also observed a Washington State plated 2003 Chevy Truck. While continued surveillance of the residence your affiant observed a male subject who looked identical to [Defendant] along with an unknown male subject and unknown female subject. Your affiant was aware that Justin McLean was working at Andy's Gas Station in Oakland, Nebraska. Your affiant then went into Andy's gas station and spoke to Mr. McLean. Mr. McLean informed your affiant that the female driving the Washington State plated vehicle is [Defendant]'s girlfriend and that they are all home.

(Ex. 1 at pp. 10-13). The affidavit then listed several vehicles "associated with the residence at 214 N Thomas Ave, Oakland and are parked on the street at that location," including a truck driven by Defendant's girlfriend; a green Chevy Trailblazer registered to Christine Bass at the residence; a red Ford F150 registered to Defendant at the residence; a white Ford F150 Supercrew registered to Richard McLean at the residence; and a white Ford F150 registered to Richard McLean, Justin McLean, and Ethan McLean at the residence. (Ex. 1 at p. 13).

4

The affidavit further stated criminal history checks were run for Christine Bass, who is a convicted felon with numerous drug charges dating back to 1985, with her most recent drug conviction out of California in 2012; Richard McLean, who had been charged in California with possessing a controlled substance but completed diversion so the charge was dismissed; and Defendant, who is a convicted felon and has numerous drug charges dating back to 1989, including a 2020 charge out of Nevada, and an arrest in San Joaquin County, California for a felony charge of transportation of a controlled substance on April 21, 2023. (Ex. 1 at pp. 13-14).

Based upon the above information, Deputy Townsend sought and obtained a search warrant for "214 N Thomas Ave, Oakland, Nebraska, 68045 LEGAL ADDRESS: L7 & 8 BLK7 OAKLAND, out buildings, vehicles associated with the property, [and] any persons found on the property or that arrive at the property" to search for "controlled substances as listed in Neb Rev. 28-405 (Reissue 1995), drug money, drug paraphernalia, homemade or otherwise; packaging material and containers used to store, distribute, and conceal controlled substances; notes, receipts, records, documents, ledgers of drug transactions and documents of venue; electronic devices and/or documentary evidence, electronic or otherwise, used to maintain records of drug transactions and concealment of controlled substances" were contained at that property. (See Exhibit 1; TR. 20).

The warrant was executed on May 6, 2023, and a variety of evidence, including drugs and drug paraphernalia, were recovered from various parts of the residence, including from Defendant's living area in the basement of the building. (Ex. 1 at pp. 20-30). A USPS package addressed to "Gene Rice" at 214 N. Thomas Ave., with no apartment number, was also found in the residence. (TR. 24; Ex. 11).

Deputy Townsend testified regarding his investigation leading to the issuance of the search warrant. Deputy Townsend testified he was the lead investigator with the Burt County Sheriff's Department regarding the investigation involving Defendant. (TR. 7-8). Deputy Townsend testified he began his investigation into Defendant after arresting two women who both provided information that Defendant was involved in distribution of methamphetamine through the mail. (TR. 8-9). Deputy Townsend learned Defendant would ship methamphetamine from California to his residence at 214 North Thomas Avenue in Oakland, Nebraska. (TR. 9).

Deputy Townsend testified he is familiar with the property at 214 North Thomas Avenue, and described it as a single family house with three levels, including a basement. The residence

has a front door, back door, and basement door, all at ground level or below. Deputy Townsend testified he drove by the residence during the day and night, and did not see any markings on the exterior entries that gave the suggestion the house contained different apartments. (TR. 52). Deputy Townsend testified that based on his observations, it appeared to be a single family house. (TR. 9-10).

Deputy Townsend testified he took steps to confirm the nature of the residence prior to seeking the warrant, including contacting the City of Oakland, which advised the residence had one water bill and one electric bill. The City also produced a landlord ordinance form reflecting a lessee of Richard McLean and five occupants residing at the residence; Defendant was not listed as an occupant. The landlord form did not indicate the residence was divided into separate apartments, and only listed 214 North Thomas Avenue as the address without identifying separate units. (TR. 10-14; Ex. 7). Deputy Townsend also found that the Burt County Assessor classified the property at 214 North Thomas Avenue as a single family home, and included a copy of the county assessor information in his search warrant affidavit. (Ex. 1 at pp. 14-15; TR. 9, 19). Deputy Townsend checked the DMV records of the individuals to whom the vehicles he saw parked outside of the residence were registered, finding Christine Bass, Defendant, and Richard McLean's DMV records all have "214 North Thomas Avenue" listed as their addresses, with no separate apartment or unit numbers identified. (TR. 15-16; Ex. 8). Deputy Townsend also checked the vehicles' registrations through the VTR database, finding there were six individuals identified as registered owners of the vehicles, all of which were registered to 214 North Thomas Ave. without any separate apartment or unit numbers. (TR. 16-17; Ex. 9). The Nebraska Criminal Justice Information System shows that the title of Defendant's F150 truck is listed at 214 North Thomas Ave. with no separate apartment or unit number identified. (TR. 17; Ex. 10).

Deputy Townsend testified he did not see any leases for the occupants of the property because private leases are not public record. (TR. 17). Deputy Townsend testified it would be possible to contact the owner of a home to obtain a copy of any tenant leases, but he does not typically contact owners of houses involved in his drug investigations because "they could tip off the suspects." (TR. 17-18).

Deputy Townsend testified five officers executed the search warrant on May 6, 2023. Deputy Townsend went to the front door by himself, two officers went to the back door, and two officers went to the exterior basement door. (TR. 21). Deputy Townsend was greeted by Justin

6

McLean at the front door. Deputy Townsend entered on the main floor, but then proceeded downstairs through the interior basement door after he "heard deputies hollering." Deputy Townsend encountered Defendant and two unidentified women in the basement. Deputy Townsend brought Defendant upstairs and read him his *Miranda* warnings and began interviewing him. (TR. 21-22). Defendant did not comment or protest when Deputy Townsend took him upstairs, nor did he indicate the upstairs was not his residence. Deputy Townsend does not recall having to open or force any doors open to get between the downstairs and main levels. (TR. 22). Body worn camera footage from the officers reflects the interior door to the basement was open. (Ex. 3 at 5:40; Ex. 5 at 0:55).

The owner of the residence, Dale Jones, testified regarding the property. Mr. Jones testified the house has five-bedrooms upstairs, and the basement apartment "is a one bedroom, full kitchen." Mr. Jones testified he rents the top part of the residence separate from the basement, and the interior door to the stairwell between them locks on both sides. (TR. 56-57). Mr. Jones testified he installed two mailboxes at the property, but "there's no numbering or anything on the boxes," and he just tells his renters, "the top one is for the top part of the house" and the other is for the "bottom part of the house." (TR. 60). As of May 2023, Mr. Jones had not placed any markings on the exterior of the building designating separate apartments. (TR. 65). When Mr. Jones first bought the property over nine years ago, the basement was unfinished; during his ownership he finished the basement, but he had not submitted anything to any public agency to indicate it was more than a single family home as of May 2023. (TR. 66).

Defendant has filed the instant motion to suppress evidence obtained from the basement during the execution of the search warrant at 214 N. Thomas Ave. (Filing No. 21; TR. 74-75). Defendant contends Deputy Townsend failed to identify the separate nature of the upstairs and basement homes in his search warrant affidavit, thereby rendering the search warrant facially invalid for lack of particularity. Defendant argues officers did not have a warrant specifically allowing them to enter Defendant's basement apartment, and thus characterizes the search of the basement as a "warrantless" search for which he provided no consent. (Filing No. 21-1 at pp. 2-7; Filing No. 49 at p. 5). Defendant also argues "the search of the basement apartment exceeded the scope of the warrant obtained" because Deputy Townsend did not have specific information "that methamphetamine was being stored at or could be picked up from the basement apartment of 214 N. Thomas Avenue." (Filing No. 21-1 at pp. 3-5).

7

The Government responds that the residence at 214 N. Thomas Avenue was classified by county tax records as a single family home, and it did not have the "typical distinctions that designate separate apartments." (Filing No. 26 at p. 9) (quoting *United States v. White*, 416 F.3d 634, 639 (7th Cir. 2005)). The Government also points out that Defendant's residence was not mistakenly searched: Defendant was the target of the drug investigation for which the warrant issued upon a showing of probable cause, and the seized evidence was recovered from his basement living space. (Filing No. 26 at pp. 9-10; Filing No. 50 at pp. 3-4). The Government argues that, even if the Court finds any violation of the particularity requirement, officers were objectively reasonable in executing the warrant by searching Defendant's basement residence. (Filing No. 26 at pp. 13-16).

## ANALYSIS

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. The Fourth Amendment's "particularity requirement prohibits officers 'from conducting general, exploratory rummaging of a person's belongings,'" . . . and demands that the warrant be 'sufficiently definite to enable the searching officers to identify the property authorized to be seized.'" *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir.), *cert. denied*, 144 S. Ct. 300 (2023) (quoting *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014)). "Whether a warrant fails the particularity requirement cannot be decided in a vacuum," *id.*, and a court should consider "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022) (quoting *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011)). "The Fourth Amendment's particularity requirement is a standard of practical accuracy rather than a hypertechnical one." *Id.* (quoting *United States v. Maccani*, 49 F.4th 1126, 1131 (8th Cir. 2022) (cleaned up)).

Defendant argues the search warrant in this case was invalid for lack of particularity because it failed to identify the separate nature of the basement apartment where he lived. (Filing No. 21-1 at p. 2). Defendant analogizes the basement within the house at 214 N. Thomas Ave. to an apartment unit within a multi-unit building. A warrant authorizing the search of an entire building may be invalid if the police have reason to believe that the building contains multiple,

separate residences. See *Marvin v. United States*, 732 F.2d 669, 673 (8th Cir. 1984) ("The validity of the warrant authorizing a search of the whole [building] depends on 'whether the police knew, or with reasonable investigation could have found out, that the building described in the warrant contained multiple residences, a fact which would place the police 'under a responsibility to pinpoint the offending unit or units.'"). "The warrant of a multi-unit structure will be valid where (1) there is probable cause to search each unit;[ ] (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit." *United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007) (citing cases); see also 2 Wayne R. LaFave et al., Criminal Procedure § 3.4(e) n.89 (Dec. 2019 Update).[4] "There is also authority for the proposition that a warrant to search a multi-unit dwelling is valid if it specifies the name of the occupant of the apartment against which it is directed, despite the absence of any physical description of the particular apartment." *Perez*, 484 F.3d at 741 n.5 (citing *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975)). The Supreme Court has recognized that the validity of a warrant must be judged on the basis of the information available at the time that the warrant issued. See *Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("[T]he discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant").

The evidence reasonably available to Deputy Townsend when he was preparing his warrant application and affidavit indicated the house at 214 N. Thomas Avenue in Oakland, Nebraska was a single family home to which all occupants had full access. First, the Burt County assessor records classified the house as a single family home, and Deputy Townsend attached a picture of the house and the printout of the tax assessor's records to his warrant application. Deputy Townsend was further advised by the City of Oakland that the house had one water bill and one electric bill. The landlord ordinance form provided by City to Deputy Townsend reflected the house's lessee was Richard McLean, and there were five occupants residing at 214 North Thomas Avenue; this form did not identify a separate unit or apartment number for any individual. Deputy Townsend also knew several individuals lived in the house from his contact with the occupants in a separate

---

[4] Discussing a "significant exception" to the general rule: "if the building in question from its outward appearance would be taken to be a single-occupancy structure and neither the affiant nor other investigating officers nor the executing officers knew or had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way, then the warrant is not defective for failure to specify a subunit within the named building."

9

investigation, including the McLeans, and had been told by Justin McLean that "his two cousins," one of which was Defendant, lived downstairs. The fact that the residents of the house were related to one another also tends to make it more likely that they treated the house as a single family home rather than a multi-unit residence.

Deputy Townsend conducted surveillance of the residence. Deputy Townsend testified he drove by the residence during the day and night, and did not see any markings on the exterior entries that gave the suggestion the single family house was divided into different apartments. At the evidentiary hearing, the owner of the residence admitted he purchased the residence as a single family home, then subsequently finished the basement and turned it into a separate living space; however, the owner testified he never notified the City or otherwise did anything to update public records regarding this change. The owner testified he had also not placed any markings on the exterior of the building to designate there were separate apartments within the house. The owner did install two mailboxes at the front of the property, but they were not labeled for separate apartments, and he has to tell his tenants which ones they should use. A USPS package addressed to "Gene Rice" at 214 N. Thomas Ave., with no apartment number, was found in the house during the search, suggesting senders of mail to the house had no way to differentiate where mail should be delivered except by the recipient's name.[5]

Deputy Townsend searched several public databases, none of which reflected the house was divided into separate units. Deputy Townsend checked DMV records for the individuals that lived there, and the VTR database for the vehicles registered to those individuals. Christine Bass, Defendant, and Richard McLean's DMV records all have "214 North Thomas Avenue" listed as their addresses, with no separate apartment or unit numbers identified. Their vehicles' registrations all reflected they were registered to 214 North Thomas Avenue, again without any separate apartment or unit numbers. The Nebraska Criminal Justice Information System showed the title of Defendant's F150 truck is listed at 214 North Thomas Avenue, without specifying a separate apartment or unit number. Nothing in Deputy Townsend's investigation or the character of the home provided him reason to believe that it was separated into distinct, private units, or that its occupants did not have access to the whole building.

---

[5] Although this package was not seized until after the warrant was issued and executed, the fact that a USPS package addressed to Defendant did not contain a separate unit or apartment number further confirms the reasonableness of Deputy Townsend's earlier belief it was a single family home, even had he taken note of the two mailboxes.

Defendant suggests that, despite all publicly available evidence reflecting there were no separate units or apartments at 214 North Thomas Avenue, Deputy Townsend should have asked the owner of the house for his private lease agreements, which would have informed Deputy Townsend the owner had separate leases with the house's upstairs and downstairs tenants. The touchstone of the Fourth Amendment is reasonableness, and the undersigned magistrate judge finds Deputy Townsend's investigation was reasonable, despite not contacting the house's owner for rental agreements before seeking the warrant. Deputy Townsend conducted surveillance of the residence and consulted DMV and VTR records, county tax assessor records, utility records, and City records, none of which identified the house as anything more than a single family home. Moreover, Deputy Townsend testified that because this was a drug investigation, he would not typically contact the owner of the home in these circumstances due to the potential that the target of the investigation could be "tipped off." Requiring Deputy Townsend to seek private lease agreements under these circumstances "would risk turning the Fourth Amendment into a hypertechnical exercise." See, e.g., *Schave*, 55 F.4th at 676 (rejecting defendant's argument that the officer "should have investigated whether anyone other than [his roommate] had access to the entire property and internet" because "[a]dopting this reasoning . . . would risk turning the Fourth Amendment into a hypertechnical exercise" and "would also verge on demanding perfection before obtaining a warrant—a measure the Fourth Amendment does not demand."); *United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis [also] governs the method of execution of [a] warrant."). Because Deputy Townsend reasonably believed the house was a single family home at the time the warrant issued, the warrant was not invalid for failing to specify a specific living unit within the residence at 214 North Thomas Avenue. See *Marvin* 732 F.2d at 673; *Garrison* 480 U.S. at 85 (validity of warrant is based upon what police knew or should have known at the time the warrant issued); *Perez*, 484 F.3d at 741 ("The warrant of a multi-unit structure will be valid where . . . the officers reasonably believed that the premises had only a single unit.").

Defendant further contends that pursuant to *Garrison*, once officers were inside the house and realized the house was a multi-unit building, they were required to discontinue their search entirely. (Filing No. 49 at pp. 2-4) (citing *Garrison*, 480 U.S. at 80). Defendant reads *Garrison* too broadly. Instead, courts have stated that if officers at first believe a building contains one residence but learn on the scene that there are multiple residences, they must stop searching the

unit *for which they lack probable cause*. See *Garrison*, 480 U.S. at 86-87; see also *United States v. Gill*, 623 F.2d 540, 544 (8th Cir. 1980) ("Federal courts long have held that police officers, before they constitutionally may search a separate residential unit within an apartment building, must have probable cause to do so that is specifically related to that unit.") (quotations omitted); *Doe v. Olson*, 691 F. App'x 272, 275-76 (8th Cir. 2017) (Kelly, J., dissenting) (citing *Garrison*, 480 U.S. at 86-87; *United States v. Williams*, 917 F.2d 1088, 1092 (8th Cir. 1990)) ("Federal courts have held that if officers obtain a warrant to search a building containing a single residential unit, and discover or reasonably should discover during the execution of the warrant that the building actually contains multiple residential units, they are required to limit their search to the unit or units for which they have specific probable cause.").

First, the undersigned magistrate judge is not entirely convinced that officers reasonably should have realized the residence was converted into a multi-unit building upon their entry. Deputy Townsend testified the basement door between the upstairs and basement was open when they entered the house, as confirmed by the officers' body worn cameras. Defendant was in his basement living area when officers entered, but he did not protest or indicate to officers that the upstairs portion was not his residence when Deputy Townsend led him upstairs. The basement did have a separate kitchen and a bedroom, which does indicate it was a separate living area; however, the McLeans, who lived upstairs, indicated their "cousins" lived downstairs, which suggests the occupants of the home were related and treating it as a single family home, rather than a traditional multi-unit dwelling. Thus, the separate nature of the living spaces may not have been completely apparent to the officers during their execution of the warrant.

Nonetheless, even assuming officers realized or should have realized the multi-unit nature of the house upon their entry, none of Defendant's briefing addresses the Government's valid point: Defendant and his residence were the targets of the drug investigation for which the search warrant was issued upon a showing of probable cause. Unlike the situation in *Garrison*, Defendant was not an innocent resident of a multi-unit building inadvertently searched by law enforcement. Instead, Deputy Townsend's lengthy warrant application and affidavit outlines his investigation into Defendant and his suspected delivery and dealing of methamphetamine from his residence.

"A supporting affidavit establishes probable cause to issue a search warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.'" *United States v. Lindsey*, 43 F.4th

843, 848 (8th Cir. 2022) (quoting *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017); see also *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) ("Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "In addition to probable cause that contraband or evidence of a crime will be found, 'there must be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016) (quoting *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999)). "Search warrant [a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir. 2002) (quotations and citations omitted). The task of the issuing judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," such a fair probability exists. *Gates*, 462 U.S. at 238. In making that determination, a judge must "consider all of the facts for their cumulative meaning," not "each piece of information independently." *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

Here, the undersigned magistrate judge finds probable cause supported the warrant for Defendant's basement residence. Deputy Townsend's affidavit contained the information that he was investigating individuals at 214 N. Thomas Ave., including Defendant, for using and selling controlled substances. Deputy Townsend began his investigation in January 2023 after he arrested a women named Samantha Craig for possessing methamphetamine. According to Ms. Craig, she and Brianna Tranmer had "picked up" a quarter pound of methamphetamine in November 2022 at 214 N. Thomas Ave. Ms. Craig provided information that Ms. Tranmer had sold six pounds of methamphetamine in Omaha, which Ms. Tranmer had obtained from Defendant at 214 N. Thomas Ave. Ms. Craig's information connects Defendant and his drug distribution activities to his residence at 214 N. Thomas Ave. See *United States v. Reed*, 25 F.4th 567, 570 (8th Cir. 2022), reh'g denied, No. 20-1042, 2022 WL 794558 (8th Cir. Mar. 16, 2022) (stating it is "proper to give [a known informant] more credence than anonymous informants because "they can be held responsible if the allegations turn out to be fabricated.").

13

Ms. Tranmer was thereafter arrested on January 14, 2023, for possession of methamphetamine with intent to deliver, and was also arrested by Deputy Townsend on January 18, 2023, for possession of methamphetamine and assault on two law enforcement officers. Ms. Tranmer confirmed Ms. Craig's information that Ms. Tranmer was obtaining large quantities of methamphetamine from her supplier, Defendant, and was selling it. Ms. Tranmer's information corroborates Ms. Craig's earlier information regarding Defendant's drug activities from his residence. See *Reed*, 25 F.4th at 570 (noting "some independent verification is required when a known informant is without a track record of reliability," but "corroboration of even minor or innocent details may be sufficient to establish probable cause").

Ms. Tranmer stated she would message or call Defendant to set up their drug transactions, and pay him in person or through CashApp. Ms. Tranmer stated Defendant received his shipments of methamphetamine of up to 3 pounds in the mail by USPS from a person in California. Officers obtained a search warrant for Ms. Tranmer's phone, which contained several text messages and CashApp payments between Ms. Tranmer and Defendant, confirming their apparent drug transactions. The text messages include statements indicating Defendant would have Ms. Tranmer meet as his residence, texting her, "When you get here call I'll come out to show you the way." Deputy Townsend also had reached out to the Post Master at USPS, finding that packages from California were being shipped to 214 N. Thomas Ave., again corroborating Ms. Tranmer's information that Defendant received methamphetamine through USPS from a person in California. New packages to that address were then flagged, but packages stopped being delivered. Deputy Townsend reviewed Ms. Tranmer's messages while she was in custody, finding she was "informing people that the feds tried getting her to roll on her supplier." During a separate investigation, Deputy Townsend made contact with Justin McLean, who lives at 214 N. Thomas Ave.; Justin advised "his two cousins" live downstairs, including Defendant, who "works on the road" and is often gone for a month or more at a time. Surveilling officers saw Defendant's F150 parked outside the house for extended periods of time. Deputy Townsend conducted criminal history checks for the occupants of the residence, finding several of them, including Defendant, have previous drug arrests and convictions. See, e.g., *United States v. Thurmond*, 782 F.3d 1042, 1045 (8th Cir. 2015) (concluding the defendant's criminal history with controlled substances supported, in part, a warrant's probable cause). Viewing the totality of the circumstances, the four corners of the warrant affidavit and application contained sufficient information establishing that

14

there was a "fair probability that contraband or evidence of criminal activity" would be found at Defendant's basement residence. See *Lindsey*, 43 F.4th at 848.

For the foregoing reasons, the undersigned magistrate judge finds the warrant was validly issued and validly executed, and therefore Defendant's motion to suppress should be denied. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Evidence and Request for Franks Hearing (Filing No. 21) be denied.

Dated this 31st day of July, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.